

IN THE
TENTH COURT OF APPEALS

No. 10-16-00030-CR

SOSIMO GONZALEZ,

Appellant

v.

THE STATE OF TEXAS,

Appellee

From the 361st District Court
Brazos County, Texas
Trial Court No. 13-05235-CRF-361

MEMORANDUM OPINION

A jury convicted Appellant Sosimo Gonzalez of the murder of Andres Tula-Penaloza (more commonly known as "Tula") and assessed his punishment at forty years' incarceration and a $10,000 fine. Gonzalez asserts in two issues that the trial court erred in the instructions given to the jury. We will affirm.

*Standard of Review*

A claim of jury-charge error is reviewed using the procedure set out in *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on reh'g). *See Barrios v. State*, 283

S.W.3d 348, 350 (Tex. Crim. App. 2009). The first step is to determine whether there is error in the charge. *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005). Only if we find error, do we then analyze that error for harm. *Id*. If there is no error, our analysis ends. *Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012). If an error was properly preserved by objection, reversal will be necessary if the error is not harmless. *Almanza*, 686 S.W.2d at 171; *see also Brock v. State*, 495 S.W.3d 1, 13 (Tex. App.—Waco 2016, pet. ref'd). The appellant must have suffered actual harm and not just merely theoretical harm. *Sanchez v. State*, 376 S.W.3d 767, 775 (Tex. Crim. App. 2012); *Arline v. State*, 721 S.W.2d 348, 352 (Tex. Crim. App. 1986). When considering whether a defendant suffered harm, the reviewing court must consider: (1) the entire jury charge; (2) the state of the evidence, including the contested issues and weight of probative evidence; (3) the argument of counsel; and (4) any other relevant information revealed by the record of the trial as a whole. *Almanza*, 686 S.W.2d at 171.

### *Self-Defense*

Gonzalez first asserts that the trial court erred by including a self-defense instruction in the jury charge despite his objection. Gonzalez elected to rely upon the defense of necessity, arguing that self-defense was not raised by the evidence. The trial court also included an instruction on necessity.

The trial court has no duty to instruct the jury on an unrequested defensive issue, even if the issue is raised by the evidence. *See Delgado v. State*, 235 S.W.3d 244, 246 (Tex.

Crim. App. 2007); *see also Posey v. State*, 966 S.W.2d 57, 62 (Tex. Crim. App. 1998). However, the trial court may, *sua sponte*, instruct the jury on an unrequested defensive issue as long as the instruction is a correct statement of the law and is supported by the evidence. *See Mendez v. State*, 545 S.W.3d 548, 552-53 (Tex. Crim. App. 2018); *see also Barrera v. State*, 982 S.W.2d 415, 416 (Tex. Crim. App. 1998). On appeal, evidence in support of a defensive issue is viewed in the light most favorable to the defense, and a defendant's testimony is by itself sufficient to raise a defensive issue. *See Elliott v. State*, 293 S.W.3d 781, 783 (Tex. App.—Waco 2009, no pet.). In determining whether the evidence raises a defense, the credibility, source, and strength of the evidence is immaterial. *Stefanoff v. State*, 78 S.W.3d 496, 499 (Tex. App.—Austin 2002, pet. ref'd); *see also Muniz v. State*, 851 S.W.2d 238, 254 (Tex. Crim. App. 1993) ("The evidence which raises the issue may be either strong, weak, contradicted, unimpeached, or unbelievable.").

Gonzalez does not argue that the instruction on self-defense given by the trial court was an incorrect statement of the law. Rather, he contends that the trial court should not have given the instruction because it was not supported by the evidence as he was illegally carrying a firearm at the time he shot Tula.[1] Assuming, without deciding,

---

[1] Section 9.31(b)(5) of the Penal Code provides: "The use of force against another is not justified . . . if the actor sought an explanation from or discussion with the other person concerning the actor's difference with the other person while the actor was . . . carrying a weapon in violation of Section 46.02." TEX. PENAL CODE ANN. § 9.31(b)(5) (West 2011). Section 46.02 prohibits carrying a handgun if the actor is not on his own premises or inside of or directly en route to a motor vehicle . . . that is owned by the person or under the person's control. . . ." TEX. PENAL CODE ANN. § 46.02 (West Supp. 2017). (Section 46.02 was amended subsequent to the murder, but the amendments do not affect this appeal.)

that the trial court erred in giving the self-defense instruction, we conclude that Gonzalez did not suffer harm.

In his brief, Gonzalez notes:

> The harm in this case was that the submission of self-defense placed defense counsel in the untenable position of being forced to argue to the jury to **disregard a defensive charge**. This served as a launching pad for the prosecutor to belittle the self-defense charge and, thereby, portray the necessity defense as just another clever defense lawyer artifice, not worthy of consideration. The necessity defense was highly contested during trial. There were only two eyewitnesses to the actual shooting: Appellant and Annie Arredondo. The submission of self-defense completely undermined any hope for success of the necessity defense.

(emphasis in original). As previously noted, we must find that the appellant suffered actual rather than theoretical harm. *Sanchez*, 376 S.W.3d at 775.

Gonzalez argues that the necessity defense was highly contested. However, a review of the record reflects that it was *self-defense* that was highly contested. The issue of self-defense permeated the trial from *voir dire* through closing arguments. The attorneys for both Gonzalez and the State spent considerable time during *voir dire* questioning the venire panel about self-defense. The State's attorney, not Gonzalez, additionally questioned the panel about the defense of necessity, although to a much lesser extent. During opening statements, defense counsel specifically stated: "[H]ow the deceased Andres Tula, died is not at issue. What's at issue is the notion of self-defense." Gonzalez's counsel further stated: "Please look at all the facts, at all the circumstances surrounding the facts and understand that my client was defending himself because he was afraid of imminent danger and death." In its opening statement, the State's attorney outlined the facts of the case, pointing out that those facts did not

constitute self-defense. The defense of *necessity* was raised in Gonzalez's closing argument after his own testimony negated self-defense. Whether self-defense was included in the jury charge or not, Gonzalez would still have needed to address the issue or leave the jury to speculate why self-defense was suddenly no longer part of the case.

Gonzalez also argues that the jury may have disregarded the necessity defense because it was belittled by the prosecutor during closing argument as an "artifice" not worthy of their consideration. However, the jury could well have disregarded the defense due to the lack of evidence that Gonzalez acted with "necessity."

The defense of necessity is closely aligned with self-defense. It is a justification defense that excuses a defendant's otherwise unlawful conduct. Like self-defense, necessity requires immediacy—"force is needed at that moment—'when a split second decision is required.'" *Henley v. State*, 493 S.W.3d 77, 89 (Tex. Crim. App. 2016) (quoting *Smith v. State*, 874 S.W.2d 269, 273 (Tex. App.—Houston [14th Dist.] 1994, pet. ref'd), *abrogated on other grounds by Clewis v. State*, 922 S.W.2d 126 (Tex. Crim. App. 1996)).

Gonzalez does not dispute that he shot and killed Tula. At trial, Gonzalez gave the following testimony as a justification for his actions:

On August 31, 2013, Gonzalez and Monica Uvalle, his girlfriend, met some friends, Victor and Ruby Balderas at Club Karma. While Gonzalez and Uvalle were dancing, Gonzlez saw a woman he had known previously, Aracely Martinez, dancing with her boyfriend. The boyfriend attacked Gonzalez, striking him in the face. Other people joined in the fracas, including Tula. Gonzalez had never seen Tula before. Tula yelled at Gonzalez, "I'm going to kill you. I'm going to kill you." Club security escorted everyone

out of the club, and Gonzalez saw Martinez's boyfriend hit Uvalle in the face as they were exiting the club. Gonzalez started to approach Tula and his friends in the parking lot, but Uvalle pulled him to their car. Tula again threatened to kill Gonzalez. Uvalle drove them away and Gonzalez directed her to take them to his house. Another vehicle began following them. When the vehicle pulled close to them, Gonzalez saw Tula point a gun out of one of the windows. Uvalle turned down another street, but Tula's vehicle did not follow them. Uvalle, who had previously dated Tula, told Gonzalez that Tula was dangerous, that he was known to carry a weapon, and that he had killed someone in Mexico. Gonzalez felt defenseless during the drive to his house because he was not armed, and he believed that Tula was going to kill him. When Gonzalez got to his residence, he went inside and retrieved three guns. Gonzales testified that the guns were stored without their magazines and that he inserted the magazines before returning to the car. Two of the guns were inside a box, and Gonzalez placed the remaining gun in the waistband of his pants where it was covered by his shirt. Gonzalez did not chamber a round in the gun before securing it at his waistband. Gonzalez did not tell Uvalle about the guns. Uvalle then proceeded to drive them to her apartment. On the way, Gonzalez saw Tula in an apartment complex parking lot talking with some people. Gonzalez did not see the friends who had been with Tula at the bar. Gonzalez told Uvalle to stop because he wanted to ask Tula why he had been following them and trying to hurt them. Although Gonzalez was frightened by Tula, he believed that his life was at risk and wanted to tell Tula to leave him alone. Gonzalez told Uvalle, "If that man is threatening

my life, I might as well take his life."[2]  Uvalle parked behind and perpendicular to the car where Tula was standing, with her driver's side closest to the other car.  Annie Marie Arredondo, who had been talking with Tula, left the other car and quickly approached Uvalle's car.  Tula remained at Arredondo's car, positioned behind the driver's side[3] door which was open.  Gonzalez got out of the passenger side of Uvalle's car and walked behind it toward Tula.  Gonzalez then asked Tula if he was Andres Tula, and Tula answered affirmatively.  Gonzalez noted that Tula "tried to turn really fast around, turn around to the door and was trying to put his hand by his waist."  Gonzalez stated that Tula came from behind the door to confront him.  Gonzalez believed that Tula was going to shoot him.  Gonzalez pulled the gun from his waistband, chambered a round, and then shot Tula, firing the gun until it ran out of ammunition.  Gonzalez then quickly returned to Uvalle's car, and he told her to drive to the Balderas's residence because it was closer than Uvalle's apartment.  Gonzalez and Uvalle told the Balderases everything that had happened.  After Gonzalez told Mr. Balderas that he wanted to get rid of the guns, Mr. Balderas told him to take them into the woods close to the Balderas's residence.  Gonzalez took the guns to the wooded area and buried them.  Gonzalez left Uvalle with the Balderases and returned to his house where he was arrested.

As is clear from Gonzalez's testimony, the immediacy of the situation had passed by the time Gonzalez retrieved his gun and shot Tula.  The record reflects that over an

[2] Gonzalez equivocated in his testimony about whether he said this to Uvalle before or after he shot Tula.

[3] Gonzales testified on direct that Tula was at the passenger-side door, but testified on cross that Tula was at the driver's side door.  Defendant's Exhibit 2, a drawing of the scene, shows Tula positioned behind the driver's side door.  Priscilla Torres testified that Tula was in front of the driver's side door.

hour had elapsed between the time of the altercation with Tula at the club and the time that Gonzalez shot Tula. The length of time that passed before the murder and Gonzalez's deliberate actions weigh against the defense of necessity. We conclude after a review of the record that Gonzalez was not harmed by the inclusion of the self-defense instruction in the jury charge. Gonzalez's claim of harm is theoretical rather than actual. Gonzalez's first issue is overruled.

### *Sudden Passion*

Gonzalez next asserts that the trial court erred in failing to give a jury instruction on sudden passion at the punishment phase. "When an appellant protests that the trial court erred not to grant his request to charge the jury regarding sudden passion, a reviewing court must first determine whether the complained-of error exists." *Wooten v. State*, 400 S.W.3d 601, 606 (Tex. Crim. App. 2013). If the reviewing court finds error, "it then analyzes whether the error harmed the appellant." *Id*. In evaluating harm, the reviewing court focuses on the evidence and record "to determine the likelihood that a jury would have believed that the appellant acted out of sudden passion had it been given the instruction." *Id*. The defendant has the burden of production and persuasion with regard to the issue of sudden passion. *Id*. at 605.

The Texas Penal Code allows a defendant at the punishment phase of a murder trial to raise the issue of whether he caused a death "under the immediate influence of sudden passion arising from an adequate cause." TEX. PENAL CODE ANN. § 19.02(d) (West 2011). "Sudden passion" is "passion directly caused by and arising out of provocation by the individual killed or another acting with the person killed which passion arises at

the time of the offense and is not solely the result of former provocation." *Id.* at § 19.02(a)(2). "Adequate cause" is a "cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection." *Id.* at § 19.02(a)(1). If a defendant presents evidence of sudden passion, he is entitled to an instruction on this mitigating circumstance even if the evidence raising such an issue is "weak, impeached, contradicted, or unbelievable." *Trevino v. State*, 100 S.W.3d 232, 238 (Tex. Crim. App. 2003); *see also Perez v. State*, 940 S.W.2d 820, 822 (Tex. App.—Waco 1997, no pet.). "In determining whether a defense is raised, the court must rely on its own judgment, formed in the light of its own common sense and experience, as to the limits of rational inference from the facts proven." *Arabie v. State*, 421 S.W.3d 111, 114 (Tex. App.—Waco 2013, pet. ref'd). The question is whether there was any evidence from which a rational jury could infer sudden passion. *See Moore v. State*, 969 S.W.2d 4, 11 (Tex. Crim. App. 1998). To justify a jury instruction on sudden passion, the record must at least minimally support an inference:

> 1) that the defendant in fact acted under the immediate influence of a passion such as terror, anger, rage, or resentment; 2) that his sudden passion was in fact induced by some provocation by the deceased or another acting with him, which provocation would commonly produce such a passion in a person of ordinary temper; 3) that he committed the murder before regaining his capacity for cool reflection; and 4) that a causal connection existed "between the provocation, passion, and homicide."

*Wooten*, 400 S.W.3d at 605 (quoting *McKinney v. State*, 179 S.W.3d 565, 569 (Tex. Crim. App. 2005)); *see also Beltran v. State*, 472 S.W.3d 283, 290 (Tex. Crim. App. 2015).

Even after taking Gonzalez's testimony in the light most favorable to the instruction, and taking his testimony as true, the evidence does not support a sudden passion instruction. "Immediacy" is a requirement for sudden passion, just as it is with self-defense and necessity. When Gonzalez shot Tula, he was not acting under the "immediate" influence of a passion nor did he commit the murder before regaining his capacity for cool reflection. The last contact with Tula, according to Gonzalez's testimony, occurred when Tula followed Gonzalez's car and pointed a gun at him. There is no indication how long the "car chase" lasted, but approximately one hour passed from the time Gonzalez was ejected from the club to the time Gonzalez shot Tula. The actions Gonzalez took during that hour—retrieving the gun, loading and hiding the gun, and locating Tula—were not those of someone acting under a sudden passion, but of someone acting after the opportunity for cool reflection. Even after Gonzalez arrived at Tula's apartment complex, he acted with deliberation rather than sudden passion. While Gonzalez testified that he shot Tula because he was afraid, his actions do not reflect that fear. Gonzalez deliberately sought Tula out after seeing him in the apartment complex. A reasonable person who was truly afraid would not have initiated the confrontation. Additionally, a mere claim of fear does not establish sudden passion arising from an adequate cause. *See Wooten*, 400 S.W.3d at 606-07; *see also Griffin v. State*, 461 S.W.3d 188, 194 (Tex. App.—Houston [1st Dist.] 2014, no pet.). The trial court did not err in denying Gonzalez's request for a sudden passion instruction.

Even if the trial court erred, we conclude that Gonzalez has failed to establish that he was harmed by the lack of a sudden passion instruction. The jury had already rejected

his necessity defense. As the *Wooten* court noted: "It is highly unlikely that a jury that had already rejected the appellant's claim that he reasonably believed that deadly force was immediately necessary to defend himself would nevertheless find in his favor on the issue of sudden passion." *Wooten*, 400 S.W.3d at 609. Having failed to show error or harm, Gonzalez's second issue is overruled.

Having overruled both issues presented by Gonzalez, we affirm the trial court's judgment.


REX D. DAVIS
Justice

Before Chief Justice Gray,*
    Justice Davis, and
    Justice Scoggins
*(Chief Justice Gray respectfully concurs in the Court's judgment to the extent it affirms the trial court's judgment. A separate opinion will not issue.)
Affirmed
Opinion delivered and filed August 15, 2018
Do not publish
[CRPM]

